## NORTH SALT LAKE v. ST. JOSEPH WATER & IRR. CO. et al.

No. 7455. Decided October 18, 1950. (223 P. 2d 577)

See 29 C. J. S. Eminent Domain, Sec. 225. City taking property of water-works system by eminent domain, 72 A. L. R. 657. See, also, 18 Am. Jur. 702.

*Clyde, Mecham & White,* Salt Lake City, *Alsup & Richards,* Ogden, for appellants.

*Rex J. Hanson and Arthur H. Nielsen,* of Salt Lake City, *Wendell B. Hammond, George K. Fadel,* Bountiful, for respondents.

LATIMER, Justice.

This suit was instituted in the court below by the town of North Salt Lake to condemn the water rights and water system of the St. Joseph Water and Irrigation Company, a public utility, and a 600 foot pipe line extension belonging to the defendant Lauren W. Gibbs. The plaintiff will be referred to as the town, the St. Joseph Water and Irrigation Company as the water company, and the other parties by their real names. The trial court permitted the town to condemn the system of the water company, but prior to the time the jury returned its verdict on the amount of

damages the court granted the town's motion to dismiss as to defendant Lauren W. Gibbs. The jury assessed the damages suffered by water company; that dispute has been settled, and that part of the law suit no longer concerns us. The appeal with which we are concerned is by Lauren W. Gibbs and Dora Squires, C. Y. Robinson and Mary Godbe Gibbs.

St. Joseph Water and Irrigation Company was organized on the 26th day of July, 1910. It was a public service corporation, engaged in the distribution and sale of culinary water. Its lines ran generally through an area known as "North Salt Lake." This area was located to the west of United States Highway No. 91, just to the north of the Salt Lake-Davis County line.

In the year 1929, a dispute arose between the St. Joseph Water and Irrigation Company and the Odell Water Company as to the territory to be served by each of the companies, particularly with respect to the north and south boundaries. The area served by the Odell Water Company was generally north of that served by the St. Joseph Water and Irrigation Company and that dispute concerned connections made by the Odell Company in the area served by the St. Joseph Company. At that time the Commission fixed the North-South boundary of the area to be served by each, but did not fix the East or West boundary lines. For the purpose of this suit it may be assumed that the Commission made no finding which would prevent the St. Joseph Company from serving users located east of the highway including the property owned by appellants. Prior to 1944 there had been little development in that territory and the water company had serviced mostly people who resided west of the roadway. Toward the south end of the area and adjacent to the main line of the water system, the water company had maintained a few service connections. Until the appellant Gibbs started to

subdivide and sell the Gibbs family property, water had not been distributed by the company in that limited area.

In the year 1944, control of the water company passed from the early owners as the stock was purchased by Ward Holbrook and members of the Gibbs family. This latter family had for many years owned a large tract of land lying east of the highway but at the time of the purchase of the water company stock it appeared on the official records as being owned by the Charles W. Gibbs Company. Charles W. Gibbs, a brother of Lauren W. Gibbs, was an officer, stockholder and director of the company bearing his name, and upon purchase of the stock in the water company he became secretary of that company. After the Gibbs family acquired an interest in the water company, Lauren W. Gibbs commenced negotiations for subdividing the tract of land standing in the name of the Charles W. Gibbs Company. The negotiations were evidence by a letter written by Lauren to his brother, Charles, outlining the oral agreement which had been discussed. This letter was dated August 4, 1945, and its principal provisions were that Lauren was to buy approximately 100 acres of the property below the upper canal; that he was to form a subdivision; that he was to pay a purchase price of $500 per acre; and that title to the property purchased was to be taken in the name of his wife, Mary Godbe Gibbs.

On December 14, 1945, the directors of the water company passed a resolution permitting Lauren Gibbs to connect on to the system and to construct an extension line running easterly from the connection to the proposed subdivision. The company was to acquire the system under a plan of repayment by money received from the sale of water. That part of the resolution dealing with the cost of construction and the method of repayment is couched in the following language:

"With the understanding that work be done by Mr. Gibbs and that the cost of the labor and material be paid for by Lauren W. Gibbs with the

understanding that the said Lauren W. Gibbs be refunded all accounts collected for water service and water connections during the period of five years from the time of completion of the extension in accordance with the conditions of paragraph 11 of the rules and regulations."

On that same date Lauren made application to the water company for connections to sixty homes which he contemplated constructing in the proposed subdivision. The company was to be paid $20.00 for each connection. In the letter of application he refers to certain conversations held with officers of the water company in which he asserts they verbally agreed to furnish water. In connection with this agreement it was understood by Lauren that approval of the applications for the connections and the furnishing of the water by the water company was dependent upon the quantity of water available.

On December 18, 1945, Lauren Gibbs forwarded a check in the sum of $800 to the water company to pay for forty of the sixty proposed connections. On March 31, 1945, the company issued a notice to applicants for service that no additional connections would be approved by the company as it had agreed to serve water to approximately sixty houses and it was doubtful that there was sufficient water available to service the applications which were pending.

Apparently the water users in the North Salt Lake area became concerned about the availability of water and the ability of the water company to meet the requirements of its users and so complaints and protests against the further extensions were filed with the Public Service Commission. On the 2nd day of May, 1946, the water company filed a new tariff and a new set of rules and regulations providing for new, and in some instances, increased rates. A formal hearing was held before the Public Service Commission on May 22, 1946, at which time testimony was given by officials of the water company, persons who had been denied service by the water company, and other interested individuals. The findings of fact made and the order entered

in that case were admitted in evidence in this matter. The findings of fact established that the commission found there was insufficient water to take care of needs of connected customers and those who had applied for connections; that Lauren W. Gibbs and his brother, Charles W. Gibbs, had purchased 50 per cent of the stock of the water company; that Lauren W. Gibbs had entered into negotiations with the company to have it furnish water to some sixty homes in the subdivision to be created by him; that five individuals whose homes were under construction were entitled to be furnished water and that six homes then being built by Lauren W. Gibbs should be furnished with water service. As part of its order, the commission decreed that the water company should discontinue the making of any additional water connections pending the completion of arrangements for an adequate supply of water.

Subsequent to the issuance of this order, Mrs. Lauren W. Gibbs diminished the supply of water available to the company by acquiring a lease to the water of a spring which was being used by the water company. In spite of the freeze order, four more connections were made by Lauren Gibbs to the extension line when this source of water was obtained by his wife. These unauthorized extensions were called to the attention of the Public Service Commission and it conducted an investigation into the operations of the water company. On the 9th day of July, 1948, the commission issued a notice of a hearing on the matter and the same was set for the 20th day of July, 1948. The record does not disclose what transpired at that hearing and what further orders, if any, were issued by the Public Service Commission.

After it was learned that the water company was prohibited from making further service connections, the company and Lauren Gibbs agreed that the ownership of the 600 feet of pipe, which had been installed by him and which was to be paid for by receipts from users, was to remain

in or revert to him and the contract of installation and purchase was mutually rescinded.

Subsequent to the order of the Public Service Commission on July 27, 1946, which prohibited further connections to the water system, the inhabitants of the area being served by the water company became fearful of losing their rights to the use of the water and so they incorporated the area into the town of North Salt Lake. For all practical purposes, the territory being served by the water company, exclusive of the Gibbs' subdivision, was incorporated within the limits of the town. The appellants other than Gibbs and his wife are owners of property located in or adjacent to the proposed subdivision, who claim they have rights to the use of water, and they sought to intervene to protect a claimed right to be furnished water through the town's system.

At the close of the trial, the court dismissed the complaints in intervention because the intervenors had suffered no damage by the taking and held as a matter of law that the town could condemn the water and water system of the water company; that it was not required to take the 600 feet of pipe line constructed by Gibbs; and, that damages had not been suffered by him.

Notice of appeal was given by the defendant Gibbs and several of the interveners, but the briefs and arguments cover issues which affect defendant Gibbs mostly and the disposition of points raised by him will decide all contentions made by the other appellants.

The points relied on by appellants for reversal are: (1) That Gibbs had an interest in the water system which could not be taken by condemnation, because it was already devoted to the highest public use; (2) that if Gibbs is wrong in his first contention, then he is entitled to damages; (3) the court committed error in permitting the town to dismiss that portion of its action seeking to condemn

the 600 feet extension belonging to Gibbs; (4) the jury should have been permitted to determine two questions; namely, whether the property of Gibbs was within the franchise area of the water company and whether there was water to supply the sixty connections called for in the Gibbs-Water company agreement; and (5) the court erred in permitting the city to furnish water through Gibbs' extension without compensating him for its use.

Counsel for appellant seek to impress on us the argument that the court, by its order of condemnation, permitted the town to cut off contract rights between Gibbs and persons residing in the territory served by the water company and thus that the order of condemnation did not condemn for a more necessary public use but condemned for the same use with the result that the action merely benefited one class to the detriment of another class. Stated in another way, that while a municipal corporation may condemn the property of a public utility and in a sense raise the standard of use by so doing, the necessary standards are not reached if the town merely attempts to substitute one group of users for another. Assuming that under certain factual situations appellants' contentions might be sustained, we are here presented with facts which establish that the city was required to furnish water to all classes who could establish valid claims to the use of water. Appellants' difficulty is that they failed to establish any right, contractual or otherwise, to the use of water.

Section 15—7—4, U. C. A. 1943, provides as follows:

"The board of commissioners, city council or board of trustees of any city or town may acquire, purchase or lease *all or any part of any water, waterworks system, water supply or property connected therewith,* and whenever the governing body of a city or town shall deem it necessary for the public good such city or town may bring condemnation proceedings to acquire the same; * * *." (Italics ours.)

Subsection (3) of Section 104—61—1, U.C.A. 1943, supplements the previous section and provides that reser-

voirs, canals, aqueducts, flumes, ditches, or pipes for conducting water for the use of the inhabitants of any county or city or incorporated town may be taken under the right of eminent domain.

These provisions in the statutes authorize North Salt Lake to condemn the system for the use of the inhabitants of that town even though the property belongs to a company which is furnishing public service. The statute makes the town use a higher use and permits condemnation when necessary for the good of the public. See McQuillin, Municipal Corporations, Chapter 32, Paragraph 1616, page 539. However, the right to condemn must be exercised in such a manner that persons who have acquired the right to the use of water are not prejudiced merely to benefit someone with equal rights.

Assuming for the purpose of this point that the water company had invaded the territory east of the highway by making some service connections. This does not require that anyone who subsequently elects to build in that area has an absolute right to have water delivered to his premises. There is an area beyond which the utility need not go to service customers and there is a maximum number of users who can be serviced. A utility can not be ordered to deliver more water than can be obtained from the source. If either can be required to furnish water to everyone residing in a town or in a given district and to everyone subsequently coming into a territory contiguous thereto, then the rights of prior users can be reduced to nothingness. In this state the Public Service Commission is vested with the power to determine the relative rights and obligations between the utility and the consumer. Section 76—4—1, U. C. A. 1943, provides:

"The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are

necessary or convenient in the exercise of such power and jurisdiction."

If the circumstances and events shown in the record be considered in chronological order then it becomes apparent that the judgment did not disturb any existing or contingent rights of appellants. At the time Lauren W. Gibbs concluded to work out a subdivision on the Gibbs property, it must be assumed that there was sufficient water to satisfy all persons then using water, as, in a subsequent hearing before the Public Service Commission, the company was ordered to furnish them and some additional users with water. However, at the time the agreement was reached between Gibbs and the water company, there was doubt in the minds of the parties that the sixty contemplated connections could be served, as it was understood that every connection was contingent upon the availability of water. That the doubts in the minds of those parties were not imaginary is confirmed by the findings of the Public Service Commission. At the hearing before that commission in May, 1946, it was concluded that the quantity of water then developed was not sufficient to permit the company to make any more extensions. The most the commission would authorize was that the company be required to furnish water to the six houses which were then under construction and no more. At the time of that hearing the water company was a public utility subject to the rules and regulations of the Public Service Commission and its findings and orders were binding on the company, its successors, those claiming through or under it, and those later dealing with it. See Section 76—3—23 and 76—6—14, U. C. A. 1943. The order contained the restriction that no further connections could be made and this was binding on the water company and controlled its obligation to furnish water to those parties who did not have water connections. If defendant Gibbs or other affected property owners claimed an impairment of their rights by the rulings made and were not satisfied with the order as

entered, then their relief was by requesting a further hearing before the Public Service Commission or by appeal to this court. Not having taken steps to have the order modified or changed, the same has the effect of a judgment and its legality cannot be attacked in this proceedings.

We are not confronted with the question of appellants' contract rights being impaired by the judgment. The rights, if any, running between Gibbs, the other appellants, and the water company were founded in the agreement to furnish connections to sixty homes. There are two reasons why the rights granted by this contract were not fixed rights which could not be impaired by condemnation proceedings or orders of the Public Service Commission. First, the duty to connect was expressly conditioned upon there being water available for use and as previously stated the Public Service Commission found there was not sufficient then developed to permit further expansion. Section 76—4—18, U. C. A. 1943, provides:

"The commission shall have power, after a hearing, to ascertain and fix just and reasonable standards, classifications, regulations, practices, measurements or service to be furnished, imposed, observed and followed by all electrical, gas and water corporations; * * *."

Accordingly, the right of the water company to bind itself to a contract to make connections and furnish water was subject to regulation by the Public Service Commission, and so long as the subject matter dealt with services over which the commission had jurisdiction, the contracting parties are presumed to have contracted with the statutory provisions in mind. Such being the case, appellants cannot successfully assert in this proceeding that they have vested rights to connections which were impaired by the condemnation.

Undoubtedly, when the town condemned the entire system of the water company, the rights and privileges that extended to, and the obligations imposed upon the water company were carried over and the town

is required to meet those obligations. But, by acquiring a system the town did not assume additional burdens and the rights of persons in or coming into the territory would not be enlarged by the court proceedings. If limitations were imposed on the water company in the hearing before the Public Service Commission, then condemnation of the property by the town would not unblock the controls. The general rule goes no further than to hold that the town takes the franchise and property subject to all burdens of furnishing water that were imposed at the time of the transfer.

Contrary to appellant's assertion, we are persuaded this suit was not instituted to prefer class against class, but rather for legitimitate municipal purposes to protect all users who could be serviced from the then available source, and, that the suit was an honest effort on the part of the town authorities to condemn a complete system without unfair discrimination and with intentions of furnishing water to all people who were legally entitled to be served at the time of condemnation. Taking by the town under such circumstances is for a more necessary public use than to which the utility was putting the water and is permitted by our statutes and decisions.

Point (2) is also resolved against appellant Gibbs. Some of the reasons advanced in discussing point (1) suggest the answer as to why Gibbs is not entitled to damages for impairment of his contract with the water company. We need not speculate on the damages that Gibbs might have suffered had he owned an enforceable contract against the company. He stipulated that his application was submitted and the approval by the company was predicated upon the condition that connections would be made only if water was available. This condition was important in view of the fact that the supply of water was extremely limited. Gibbs was afforded an opportunity to establish the availability of water when the

matter was heard before the commission, but in this he must have failed as a contrary finding was made. His rights to have water furnished, if any, must be determined at the time the matter was in issue before the Public Service Commission and the trial court could not overturn the findings of that body on factual matters in issue in a proceeding which it had jurisdiction to hear. If for the moment we revert back to the time just before these proceedings were started it becomes apparent that the rights between the water company and Gibbs and the parties claiming through his contract had to be determined in the proceedings before the Public Service Commission. It was the forum charged with controlling the affairs of the company. The commission's earlier finding that water was unavailable would prevent applicants from legally obtaining connections until that finding was overturned. This latter result could not be reached except by a showing before the commission of a change of circumstances subsequent to the finding. Under the present record Gibbs' contractual rights and those of any third party beneficiaries were barred by the order of the commission so that if he or they suffered any damage, it was by that order and not by a breach of contract by the water company or its successor in interest.

In discussing point (3) we treat only with the contract for constructing the pipe line and not with the claimed agreement to make and furnish water for sixty connections. The trial court did not err in permitting the town to dismiss its action against the defendant Gibbs. When the proceedings were instituted the town alleged that all of the property sought to be condemned was owned by the water company except the 6-inch line running approximately 600 feet, which was claimed by Gibbs. The validity of the claim or the exact nature of the rights possessed by Gibbs and the company in the extension system may not have been known to the plaintiff prior to the

time the evidence was introduced. In starting a suit it is the best practice to join all parties who claim ownership in the system, whether valid or not, and apparently this was done. Under our statutes a voluntary dismissal may be granted by the Court when such dismissal is furtherance of justice. When it became apparent that Gibbs and the water company had revoked and rescinded the contract agreement, there was no valid reason why the town need further pursue condemnation proceedings against Gibbs. By agreeing to revoke the construction contract he released the company from having to pay for the system and he permitted the company to relieve itself of any burden in any way connected with the extension system. The company system and the Gibbs system then became severable and if the water company had no right to own or possess the extension system or to control the flow of water through it, and no obligation to reimburse Gibbs for his expenditures, then the town would inherit no such rights or have imposed on it any such obligations. It has been held that if a condemnor seeks to condemn only part of a system, it is liable for the amount it depreciates the remaining portion, but this rule has no application where there are two systems separate and distinct from each other, and where there are no interrelated or interlocking rights. Appellant Gibbs is, therefore in error in his contention that these proceedings confiscated his contract rights as he had relinquished them prior to the time the action was started. Insofar as the physical properties are involved, Gibbs has the same right of ownership and possession he always had. Insofar as contractual rights are concerned, these were eliminated by the acts of the parties to the contract and not by these proceedings.

We are unable to pass on the contention that the motion to dismiss should not have been granted for the reason that Gibbs is entitled to damages for the use of the pipe line ex-

tension during the time of temporary occupancy. While it is not clear what damages Gibbs might have suffered, nevertheless, he was prohibited from exercising control over the system during the time the town had possession. The reason that we are precluded from considering the question is that issues were not framed in the court below. We cannot pass on matters raised for the first time in this court. It must be admitted that the motion for dismissal was granted after the jury had retired, but even so, Gibbs could have requested permission to enlarge the issues when the court announced its ruling or in the proceedings subsequent to trial. Not having done so, the matter is not properly before us. This holding may not preclude Gibbs from a determination of this matter if damages have been suffered by him. There is no apparent reason why the procedure followed in the case of *Moyle* v. *Salt Lake City*, 111 Utah 201, 176 P. 2d 882, is not available to him. There, the condemnee commenced a separate action for damages suffered during temporary occupancy by the town and a judgment for damages was affirmed by this court.

Section 104—61—10, U. C. A. 1943, provides that if occupancy of the premises is desired while the action is pending, the plaintiff must execute and file in court a bond conditioned to pay all damages arising from occupation before judgment in case the premises are not condemned. This section contemplates that damages might flow from occupancy of the premises and that if so, the plaintiff shall reimburse the defendant. It necessarily follows that unless Gibbs is barred for other reasons, the issue of damages could be litigated under appropriate pleadings in an original action. Without issues having been fashioned before the trial court and without evidence upon which that court could base a finding, an appealable question on this element of damage is not presented in this appeal.

In disposing of point (4) we conclude the jury should not have been permitted to determine whether or not there was sufficient water to supply all sixty connections, or whether the property of Gibbs and the intervenors was in the franchise area. The first question has been submitted to and decided by the Public Service Commission in an appropriate proceeding. It is not the function of a jury to be called upon to find in support of or contrary to a finding of an administrative body. A finding of the Public Service Commission on a disputed question of fact cannot be collaterally attacked by having a jury find contrariwise. Section 76—6—14, U. C. A. 1943 provides that in all collateral actions of proceedings the orders of the Commission which have become final shall be conclusive.

The second of the two questions seems immaterial in these proceedings and is so closely related to the first that they fall together. The action was to determine the amount to be paid the company for the property taken by the town. It would make little difference to the matter in issue whether the land owned by certain property owners was either within or without the territory being partially serviced with water, if the quantity of water available would not permit further expansion. It is not contended that intervenors had rights superior, or even equal, to the rights of prior users, in the town area. It is, however, contended that if the jury found their land to be within the territory served by the water company that would entitle them to have service as a matter of right. Such is not the law. Prior users have a right to be protected and those seeking subsequent connections are limited by the amount of water available for use. Moreover, in this instance if any rights ran to the intervenors because of the dealings between Gibbs and the Water company, they were conditional rights which have not vested because of the findings of the Public Service Commission. If it subse-

quently develops that sufficient water has been or can be developed to supply all users in the territory, then the city should give consideration to the applications of land owners in the territory. Until that is made to appear in an appropriate proceeding there is no materiality to the issue as to whether the land is within or without the area as the owner could not be furnished water in either event.

We overrule defendant's last contention that the court erred in permitting the town to furnish water through Gibbs' pipe line. At first glance it may appear that the judgment entered created an encumbrance against the Gibbs system. A closer analysis of the problem establishes that such is not the case. Presently, the six users are obtaining their water through the Gibbs system. However, the judgment does not require that Gibbs keep his conduits available for that purpose or provide that the users are entitled to make use of that system. The city is required to furnish water just as its predecessor company was required to do, that is, to furnish a given quantity to the point where the Gibbs system tied on. From the time the construction contract was rescinded, neither the water company nor the town has had anything to say about the rights to the use of the Gibbs system. Their only obligation was to deliver water to that system, not to distribute water through the pipes. While Gibbs originally had the right to retain all monies received from the sale of water to the users until he was reimbursed for his expenditures, when he agreed to rescind the contract he elected to retain the system and waive his rights to payment through company sources. The rescission thus left him with the system and with the right to obtain payment from some other source if he had not contracted that right away. We are not informed as to the terms of the contracts between Gibbs and the purchasers of land in the proposed subdivision, but if under his contracts of sale, Gibbs is required to permit the use of his system for delivery of

water, then the encumbrance is created by him and not by the court decree. If the contracts do not so prescribe, the users must either obtain the water through a different channel or make some arrangement with Gibbs for the use of his system. The obligation inherited by the city is that it furnish the necessary quantity of water at the end of its system, not at the terminal of the user. As to how the water is carried from the town system to the home of the user is a matter which does not concern the town.

The judgment is affirmed, costs to respondent.

PRATT, C. J., and WADE, WOLFE, and McDONOUGH, JJ., concur.